IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

SHELLIE JEAN FRANKLIN,
on behalf of her grandson, QLS, a minor                                    PLAINTIFF

V.                              Case No. 2:25-CV-00080-KGB-BBM

FRANK BISIGNANO,[1]  Commissioner,
Social Security Administration                                             DEFENDANT

## RECOMMENDED DISPOSITION

This Recommended Disposition ("Recommendation") has been sent to Chief United States District Judge Kristine G. Baker. Either party may file written objections to this Recommendation. Those objections should be specific and should include the factual or legal basis for the objection. To be considered, objections must be received in the office of the Court Clerk within 14 days of this Recommendation. If no objections are filed, Chief Judge Baker can adopt this Recommendation without independently reviewing the record. By not objecting, parties may waive the right to appeal questions of fact.

I.      INTRODUCTION

On February 1, 2009, the Social Security Administration ("SSA") found Q.L.S., the minor claimant, disabled and awarded him supplemental security income disability benefits. (Tr. at 15, 173). On March 6, 2018, the SSA reviewed and continued the claimant's disability. (Tr. at 18, 173). At a subsequent review on September 17, 2021, the

---

[1] On May 7, 2025, Frank Bisignano was sworn in as Commissioner of the Social Security Administration, and pursuant to Federal Rule of Civil Procedure 25(d), he is automatically substituted as the Defendant.

SSA determined that Q.L.S., who was then twelve years old, had improved and was no longer disabled as of September 1, 2021. (Tr. at 15, 146). The discontinuation of benefits was upheld on reconsideration. (Tr. at 15). Thereafter, Q.L.S.'s grandmother, Shellie Franklin, requested a hearing before an Administrative Law Judge ("ALJ"). *Id*. At the hearing on February 7, 2023, Franklin and Q.L.S. appeared *pro se*. (Tr. at 96, 98–99). The ALJ issued a decision on February 28, 2024, affirming that Q.L.S.'s disability ended on September 1, 2021. (Tr. at 27). Franklin requested review, and she supplied additional school and medical records to the Appeals Council. (Tr. at 33–95). On December 13, 2024, the Appeals Council found that the additional evidence did not show a reasonable probability of changing the outcome of the decision and denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. at 5–6).

For the reasons set forth below, the Court recommends that the decision of the Commissioner be affirmed.

## II.    THE COMMISSIONER'S DECISION

If a child is found eligible for disability benefits, the child's continued eligibility must be reviewed periodically. 20 C.F.R. § 416.994a(a). The ALJ uses a three-part sequential analysis for evaluating continued disability. *Id*. First, the ALJ must determine whether there has been any "medical improvement" in the child's condition since the Comparison Point Decision ("CPD"), which is the most recent favorable decision regarding benefits. *Id*. § 416.994a(b)(1). If there has been no medical improvement, the ALJ must find that disability continues, unless a specific exception delineated in the applicable regulations applies. *See id*. § 416.994a(b)(1), (e)–(f).

If there has been medical improvement, the ALJ proceeds to the second step and considers whether the impairment or impairments previously identified at the CPD still meet or equal the severity of the listed impairment they met or equaled at the time of the CPD. 20 C.F.R. § 416.994a(b)(2). If so, the ALJ must find that disability continues; if not, the ALJ proceeds to the third, final step.

In the final step, the ALJ determines whether the child is currently disabled, considering all impairments the child now has, including any that the child did not have at the time of the CPD, or that were not considered at that time. 20 C.F.R. § 146.994a(b)(3). Determining current disability requires its own additional three-step analysis. First, the ALJ determines whether the child currently has a severe impairment or combination of impairments. *Id*. § 416.994a(b)(3). A medically-determinable impairment or combination of impairments is severe unless it is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." *Id*. § 416.924(c). If the child has a severe impairment or combination of impairments, the ALJ proceeds to the second step of the additional analysis—the ALJ determines whether the child's impairment or combination of impairments meets or medically equals the severity of any impairment listed in 20 CFR Part 404, subpart P, Appendix 1. *Id*. § 416.994a(b)(3). If so, the ALJ must find that disability continues. If not, the ALJ proceeds to the last step— whether the child's impairment or combination of impairments functionally equals a listed impairment. *Id*. § 416.994a(b)(3). If so, the ALJ must find that disability continues.

Here, the ALJ found that the most recent favorable medical decision was on March 6, 2018. (Tr. at 18). At that time, Q.L.S. had two medically-determinable impairments:

3

learning disorder and attention deficit hyperactivity disorder ("ADHD"). *Id*. The ALJ found that Q.L.S.'s impairments had medically improved as of September 1, 2021. *Id*. The ALJ then determined that Q.L.S.'s impairments no longer met or medically equaled Listing 112.11.[2] (Tr. at 19). Next, the ALJ found that Q.L.S. had not developed any additional impairments since the CPD. *Id*. Finally, the ALJ evaluated functional equivalency, finding that Q.L.S. had marked limitation in only one domain—acquiring and using information. (Tr. at 22). The ALJ therefore concluded that Q.L.S.'s impairments had not met, medically equaled, or functionally equaled a listed impairment since September 1, 2021, effectively ending his disability. (Tr. at 26–27).

## III.    DISCUSSION

### A.    Standard of Review

"In reviewing the ALJ's decision," the Court "examine[s] whether it is supported by substantial evidence on the record as a whole and whether the ALJ made any legal errors." *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). "Substantial evidence is that which a 'reasonable mind might accept as adequate to support a conclusion,' whereas substantial evidence on the record as a whole entails 'a more scrutinizing analysis.'" *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted). "Our review 'is more than an examination of the record for the existence of

---

[2] In Listing 112.11, neurodevelopmental disorders require medical documentation of one of the following: (1) (a) frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks or (b) hyperactive and impulsive behavior; (2) significant difficulties learning and using academic skills; or (3) recurrent motor movement or vocalization. 20 C.F.R. Part 404, Subpart P, Appendix 1. Moreover, Listing 112.11 requires an extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. *Id*.

substantial evidence in support of the Commissioner's decision . . . . [W]e also take into account whatever in the record fairly detracts from that decision.'" *Gann v. Berryhill*, 864 F.3d 947, 950–51 (8th Cir. 2017) (citation omitted). "Reversal is not warranted, however, 'merely because substantial evidence would have supported an opposite decision.'" *Reed*, 399 F.3d at 920 (citation omitted).

In clarifying the "substantial evidence" standard applicable to review of administrative decisions, the Supreme Court has explained: "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is 'more than a mere scintilla.'" *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citation omitted).

## B.    Franklin's Arguments on Appeal

Franklin argues that the ALJ erred in finding that Q.L.S.'s disability ended in September 2021. (Doc. 17 at 5–6). Specifically, Franklin submits that the ALJ: (1) neglected to apply the proper medical-improvement review standard and erroneously found medical improvement, (*id*. at 6–11); (2) failed to consider the combined effects of Q.L.S.'s impairments, including new mental-health impairments, (*id*. at 11–14); and (3) erred in determining that Q.L.S. did not meet the requirements of functional equivalence, (*id*. at 15–18). For the reasons stated herein, the Court recommends that the Commissioner's decision be affirmed.

### 1. Substantial evidence supports the ALJ's finding that Q.L.S. medically improved.

Franklin first contends that the ALJ erred in evaluating Q.L.S.'s continued disability and finding medical improvement. (Doc. 17 at 6–11). In support, Franklin asserts (1) that the ALJ failed to apply the proper legal presumption that Q.L.S.'s disability continued, (*id.* at 8); (2) that the ALJ's finding of medical improvement is not supported by substantial evidence, (*id.* at 9); and (3) that the ALJ did not explain how Q.L.S.'s condition had medically improved since the CPD, (*id.* at 10). Upon review, this Court finds that the ALJ applied the correct legal standard, and the decision is supported by substantial evidence.

Turning initially to whether Q.L.S. is entitled to a presumption of continued disability, the law is settled that no presumption exists. Although a presumption was recognized in *Rush v. Secretary of Health & Human Services*, 738 F.2d 909, 915 (8th Cir. 1984) (holding that "in a disability-termination proceeding, there is a presumption that a claimant who has previously been determined to be disabled remains disabled"), when Congress enacted the Social Security Disability Benefits Reform Act of 1984, Pub. L. No. 98-460, 98 Stat. 1794, it made clear that disability terminations are to be made "on a neutral basis, without any initial inference as to the presence or absence of disability being drawn from the fact that you have been previously found disabled." 20 C.F.R. § 416.994a(a)(2); *see also Polaski v. Heckler*, 751 F.2d 943, 945–46 (8th Cir. 1984) (acknowledging that the portion of *Rush* recognizing a presumption of continued disability "no longer stands"), *cert. granted, judgment vacated on other grounds sub nom. Bowen v. Polaski*, 476 U.S. 1167 (1986). Thus, Franklin is incorrect that the ALJ erred by not applying a presumption of

continued disability in this case.

Franklin next argues that the ALJ's finding of medical improvement is not supported by substantial evidence and is not "adequately explained." (Doc. 17 at 9–10). Franklin maintains that, because Q.L.S. "continues to have significant cognitive and academic deficits, as demonstrated by his very low IQ scores and his need for special education services and accommodations[,] . . . [the] evidence contradicts a finding of medical improvement." *Id*. at 11. In particular, Franklin emphasizes Q.L.S.'s full-scale IQ scores of 71 and 70 in August 2021 and April 2022; his academic-testing performance being significantly below grade level in multiple areas; and his continued need for special-education services and accommodations. (Doc. 17 at 9).

At the outset, it is important to note that the question is not whether Q.L.S. was still impaired in September 2021—*i.e.*, still had a learning disorder and ADHD—but whether the severity of his impairments decreased since the CPD. "Medical improvement is *any* decrease in the medical severity of [the child's] impairment(s) which was present at the time" of the CPD. 20 C.F.R. § 416.994a(c) (emphasis added). Although "the decrease in severity may be of *any quantity or degree*," the ALJ must "disregard minor changes in [the child's] signs, symptoms, and laboratory findings that obviously do not represent medical improvement and could not result in a finding that [the] disability has ended." *Id.* (emphasis added).

In evaluating whether Q.L.S. medically improved, the ALJ noted that, at the CPD (in 2018), Q.L.S. received special-education services and had an IEP for ADHD and a learning disorder. (Tr. at 18–19). He was "well below grade level in multiple classes and

his Teacher Report noted obvious to serious problems in multiple domain areas of development." (Tr. at 19). In fact, a teacher questionnaire dated February 13, 2018, reported that Q.L.S. had obvious-to-serious problems in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. (Tr. at 280–87).

In comparison, the ALJ found that, as of September 1, 2021, although Q.L.S. still received special-education services for multiple classes and had an IEP to allow accommodations for ADHD symptoms, "he did not receive any type of treatment for this condition and his Teacher Report did not indicate any serious behavioral problems at school." (Tr. at 19). A March 2023 IEP assessment noted that, although Q.L.S. still struggled with academic skills, he was "sociable, enjoys extracurricular activities, and handles daily tasks independently." (Tr. at 42).

The ALJ also cited Q.L.S.'s mental-health evaluation with Dr. Kenneth Jones, during which testing revealed Q.L.S. had an "unspecified learning disability." (Tr. at 20). Dr. Jones also reported, however, that Q.L.S. was responsive to directions, able to understand and respond for testing, displayed age-appropriate expressive and language abilities, and reported making and keeping friends. (Tr. at 437–41). Although Q.L.S.'s performance on the WISC-V test showed borderline range, Dr. Jones indicated that Q.L.S. appeared capable of learning and performing basic, repetitive tasks with appropriate supervision; displayed average attention and concentration; and could complete age-appropriate tasks. *Id*. Dr. Jones acknowledged that Q.L.S. would benefit from additional time and tutoring for academic tasks and would have trouble performing academic tasks in

8

a timely manner. *Id*.

Further, the ALJ considered Q.L.S.'s psychological evaluation from April 11, 2022, which revealed a full-scale IQ of 70, which is considered very low range of intellectual functioning. (Tr. at 20–21, 34–40). His vocabulary subtest, however, indicated areas of relative strength, including word knowledge, retrieving acquired information with verbal expression, and good abstract reasoning skills. *Id*. Additional test results showed that Q.L.S. had academic deficits in math problem solving, word reading, and numerical operations, which were areas amenable to remediation with placement in special services. *Id*. Q.L.S.'s adaptive functioning was in average range. *Id*.

Additionally, the ALJ found the opinions of two state-agency medical consultants to be persuasive. (Tr. at 21). Both found Q.L.S. had medically improved. (Tr. at 111–13, 120–25). Dr. Susan Schmitz determined that Q.L.S. had marked limitation in acquiring and using information, and Dr. Susan Manley agreed on reconsideration. *Id*. The ALJ found that the opinions were consistent with evidence in the record showing that Q.L.S. receives assistance for academic deficits in core classes. (Tr. at 21).

In summary, the ALJ compared the current medical evidence to the medical evidence from the time of the CPD and found that there had been a decrease in the medical severity of Q.L.S.'s impairments since the CPD. (Tr. at 19). The ALJ cited evidence in the record showing that Q.L.S. no longer had serious behavioral problems and that he no longer required treatment for his condition. *Id*. While minor changes are to be disregarded, a decrease in severity of any quantity or degree will suffice to sustain an ALJ's finding of medical improvement. *See* 20 C.F.R. § 416.994a(c). Here, Q.L.S.'s behavioral

improvement and lack of treatment were sufficient to support the ALJ's finding of medical improvement. *See Briggs v. Callahan,* 139 F.3d 606, 608–09 (8th Cir.1998) (finding denial of benefits supported when child's hyperactivity improved with medication and behavior was appropriate at school). Franklin's assertion that the ALJ's decision lacks sufficient detail and record support is unfounded. The ALJ articulated his reasoning, and substantial evidence in the record supports his conclusion.

> **2.      The ALJ properly considered Q.L.S.'s impairments in determining whether his disability continued.**

In her second point, Franklin contends that the ALJ failed to evaluate Q.L.S.'s new mental-health impairments and consider them in combination with his other impairments. (Doc. 17 at 12–14). Specifically, Franklin submits that Q.L.S. developed posttraumatic stress disorder ("PTSD") and major depressive disorder following the death of his mother in May 2021 and that the ALJ did not consider those additional impairments when evaluating Q.L.S.'s continued disability. *Id*. at 12–13. Because substantial evidence supports the ALJ's finding that Q.L.S. did not develop new impairments since the CPD, the ALJ correctly excluded PTSD and depression in the calculus of his decision.

In determining disability for children, an ALJ is required to "consider the combined effects of all [a claimant's] impairments upon . . . overall health and functioning." 20 C.F.R. § 416.924(a). An impairment must be "medically determinable," meaning it "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," and "it must be established by *objective medical evidence* from an *acceptable medical source*." *Id*. §

416.921 (emphasis added).

Although the ALJ acknowledged that Q.L.S. received outpatient therapy with Erin Wren, a Licensed Master Social Worker or LMSW, for PTSD and recurrent major depressive disorder from February 2023 to May 2023,[3] the ALJ was not required to consider PTSD or depression as impairments because an LMSW is not an "accepted medical source" who can provide objective medical evidence to establish an impairment. 20 C.F.R. § 416.902(a). Thus, at the time of the ALJ's decision, the record did not contain objective medical evidence to establish the additional mental-health impairments of PTSD or depression, and the ALJ was correct not to consider them as new impairments.

Approximately a year after Q.L.S. received treatment with Wren (and about a month after ALJ's decision), Q.L.S. saw Marcie Tuggle, APRN, who diagnosed him with PTSD and depression.[4] (Tr. at 70–73). APRN Tuggle's examination notes reveal that Q.L.S. reported having "some anxiety and some little panic attacks," not sleeping well, and

---

[3] Q.L.S. began seeing Wren for mental-health treatment two days after the February 2023 hearing before the ALJ. (Tr. at 96, 455). The ALJ noted that Q.L.S. reported a depressed mood after the death of his mother. (Tr. at 21, 461). However, the ALJ also stated that Wren described Q.L.S. as having average demeanor, clear speech, full affect, good grooming, normal activity level, no cognitive impairment, average intelligence, and good prognosis. (Tr. at 21, 460, 462, 465–66, 468–69, 471–72, 474–75).

[4] Franklin submitted the record of Q.L.S.'s April 2024 appointment with APRN Tuggle to the Appeals Council, which found that the evidence did not show a reasonable probability of changing the outcome. (Tr. at 6). In cases involving the submission of supplemental evidence after the ALJ's decision, the record includes the evidence submitted after the hearing. *See Jenkins v. Apfel*, 196 F.3d 922, 924 (8th Cir. 1999) (citing *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)); *see also Browning v. Sullivan*, 958 F.2d 817, 823 n. 4 (8th Cir. 1992) (noting that additional evidence submitted to the Appeals Council following an ALJ's decision becomes part of the administrative record for judicial review). "When the Appeals Council has considered new and material evidence and declined review, we must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence." *Kitts v. Apfel*, 204 F.3d 785, 786 (8th Cir. 2000). Evaluating the new evidence requires the court to determine how the ALJ would have weighed the newly submitted evidence if it had been presented at the original hearing. *Jenkins*, 196. F.3d at 924.

11

"suffer[ing] from depression sometimes" because of his mom's death. (Tr. at 65).

Reviewing all the evidence—including APRN Tuggle's examination—the Court is satisfied that the ALJ properly evaluated Q.L.S.'s impairments. Notably, the ALJ demonstrated this in his decision by: (1) affirming that he considered "all of the evidence of record," (Tr. 15); (2) stating that he was considering Q.L.S.'s impairments and combination of impairments, (Tr. 17, 27); and (3) recognizing his obligation to "consider the interactive and cumulative effects of the claimant's impairment or multiple impairments" when discussing functional equivalence, (Tr. at 17). Although the ALJ did not find that PTSD or depression were new impairments, the ALJ explicitly considered Wren's observations of Q.L.S.'s mental health when evaluating functional equivalency. (Tr. at 21). While the ALJ did not have APRN Tuggle's diagnosis or examination notes, the Court is not persuaded that a single visit with APRN Tuggle diagnosing Q.L.S. with PTSD and depression would have resulted in the ALJ reaching a different conclusion in this case.[5] For these reasons, Franklin's argument on this point fails.

### 3. Substantial evidence supports the ALJ's finding that none of Q.L.S.'s impairments or combination of impairments functionally equaled a listed impairment.

In her final argument, Franklin asserts that the ALJ erred in evaluating whether Q.L.S. met the functional-equivalence standard. (Doc. 17 at 14–18). Franklin maintains that the ALJ erred in finding that Q.L.S. had marked limitation in only one domain, when

---

[5] The existence of a medically-determinable impairment cannot be established by a claimant's statement of symptoms, a diagnosis, or a medical opinion—there must be objective medical evidence from an acceptable medical source. *See* 20 C.F.R. § 416.921.

"the evidence suggests he likely has 'marked' limitations in at least one additional domain." (*Id*. at 16). Franklin further argues that the ALJ improperly discounted Franklin's own testimony without providing specific, legally sufficient reasons for doing so. (*Id*. at 18). This Court finds no deficiencies in the ALJ's evaluation of functional equivalence.

To "functionally equal" a listed impairment, the severe impairment or combination of impairments "must be of listing-level severity; *i.e.*, it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. *Id*. § 416.926a(b)(1)(i)–(vi). A limitation is considered "marked" when the impairment or combination of impairments "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Id*. § 416.926a(e)(2)(i). An "extreme" limitation exists when the child's impairment or combination of impairments "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Id*. § 416.926a(e)(3)(i). When evaluating functional equivalence, the ALJ must assess the interactive and cumulative effects of all impairments for which there is evidence, including any impairments that are not severe. *Id*. § 416.926a(a). Moreover, when determining whether a limitation on a child's functioning is marked or extreme, the ALJ must "compare [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments." *Id*. § 416.926a(f)(1).

Franklin suggests that Q.L.S. has marked limitation in the following domains: (1)

attending and completing tasks due to his ADHD and his anxiety; (2) interacting and relating to others due to his PTSD and depression; and (3) caring for himself due to his PTSD and depression. (Doc. 17 at 16). The focus of Franklin's argument is that the ALJ failed to account for Q.L.S.'s new mental-health impairments—PTSD and depression—when determining functional equivalence. Because, as noted earlier, the ALJ (appropriately) did not find PTSD or depression to be new medically-determinable impairments, any argument that the ALJ's functional-equivalency analysis is deficient for failing to consider new impairments is without merit. To the extent Franklin argues, however, that the ALJ otherwise erred in evaluating functional equivalence, substantial evidence supports the ALJ's decision.

The ALJ found that Q.L.S. had marked limitation in acquiring and using information, but no other marked or extreme limitations in the additional five domains. (Tr. at 21–26). The ALJ noted that Q.L.S. had: (1) less than marked limitation in attending and completing tasks; (2) no limitation in interacting and relating to others; (3) no limitation in moving about and manipulating objects; (4) no limitation in caring for himself; and (5) no limitation in health and well-being. (Tr. at 22–26). The Court will limit its review to the domains directly challenged by Franklin—Q.L.S.'s ability to attend and complete tasks, interact and relate to others, and care for himself.

In reaching his decision that Q.L.S. had less than marked limitation in attending and completing tasks, the ALJ considered that Q.L.S. needed additional assistance at school in his core courses. (Tr. at 22–23). Additionally, the ALJ noted that, according to Dr. Jones, Q.L.S. displayed average attention and concentration during his assessment and that

14

Franklin reported Q.L.S. was able to perform all age-appropriate adaptive-functioning tasks. (Tr. at 22–23, 113, 437–41). The ALJ recognized Q.L.S.'s documented need for extra time to complete schoolwork and records demonstrating his distractibility, difficulty concentrating, and severe anxiety, finding that Q.L.S. had some limitation in attending and completing tasks, but it was *less than marked*. (Tr. at 22–23). Although evidence in the record could support a different conclusion, the ALJ's decision is within the available "zone of choice." *Ross v. O'Malley*, 92 F.4th 775, 779 (8th Cir. 2024) (holding that affirmance is appropriate where the record supports two inconsistent conclusions, both of which are in the available zone of choice).

In addressing Q.L.S.'s ability to interact and relate to others, the ALJ cited various examples of difficulties a child could have, such as having no close friends; avoiding or withdrawing from people he knows; being overly anxious or fearful of meeting new people; having difficulty playing games or sports with rules; and difficulty communicating with others. (Tr. at 24). The ALJ found no limitation in this domain, noting that Q.L.S. had clear speech during his mental evaluation with Dr. Jones and that Q.L.S. reported to Wren that he engages with his peers and has at least five friends. (Tr. at 24, 59, 438). Franklin cites Q.L.S.'s self-reported social withdrawal and auditory hallucinations during his therapy with Wren as support for finding marked limitation in interacting and relating to others. (Doc. 17 at 16). Yet again, however, the ALJ's decision is within the zone of choice.

As for Q.L.S.'s ability to care for himself, which would include Q.L.S.'s ability to dress, bathe, understand acceptable versus unacceptable behavior, and appropriately express his feelings, the ALJ noted there was no evidence in the record to show any

15

limitation in this domain. (Tr. at 25–26). A careful review of the record shows no indication that Q.L.S. struggled with this area.

Overall, the ALJ found that the evidence did not rise to the level of finding marked limitation in any domain other than Q.L.S.'s ability to acquire and use information, and substantial evidence supports the ALJ's determination. Insofar as Franklin is inviting the Court to reweigh the evidence, it is not the role of this Court to do so. *See Schmitt v. Kijakazi*, 27 F.4t 1353, 1361 (8th Cir. 2022) (citing *Johnson v. Colvin*, 788 F.3d 870, 872 (8th Cir. 2015).

Franklin additionally argues that the ALJ "gave [Franklin's] testimony limited weight without adequate explanation." (Doc. 17 at 18). But the law does not require the ALJ to articulate his reasoning regarding Franklin's testimony. 20 C.F.R. § 416.920c(d) ("We are not required to articulate how we considered evidence form nonmedical sources using the requirements (a)–(c) in this section."). Nevertheless, the ALJ cited information provided by Franklin when weighing whether Q.L.S.'s disability had ended in this case. (Tr. at 23). Because the ALJ was not required to provide a detailed evaluation of Franklin's testimony, no error occurred.

## IV.    CONCLUSION

Although this is a challenging case involving a claimant who was found to be disabled before he was two months old, the Court can discern no error in the ALJ's findings and ultimate determination that Q.L.S.'s impairments had medically improved as of September 1, 2021, and he is no longer disabled. Because the Commissioner's decision is supported by substantial evidence, the Court recommends that it be affirmed.

16

IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's decision be AFFIRMED.

2.    Judgment be entered for the Defendant.

DATED this 15th day of July, 2026.


_____
UNITED STATES MAGISTRATE JUDGE