**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**SHELLIE JEAN FRANKLIN,**
**on behalf of her grandson, Q.L.S., a minor** **PLAINTIFF**

**v.** **Case No. 2:25-cv-00080-KGB**

**COMMISSIONER**
**SOCIAL SECURITY ADMINISTRATION** **DEFENDANT**

**ORDER**

Before the Court is United States Magistrate Judge Benecia B. Moore's Recommended Disposition ("Recommendation") (Dkt. No. 24). Plaintiff Shellie Jean Franklin, on behalf of her grandson, Q.L.S., a minor, filed objections to the Recommendation and requested a *de novo* review of the record (Dkt. No. 25). After conducting a *de novo* review of the record, including the Recommendation and Franklin's objections, the Court adopts the Recommendation in its entirety as this Court's findings in all respects. The Court writes separately to address Franklin's objections.

**I. Background**

On February 1, 2009, the Social Security Administration ("SSA") found Q.L.S., the minor claimant, disabled and awarded Q.L.S. supplemental security income disability benefits (Dkt. No. 7 at 20, 178). On March 6, 2018, SSA reviewed Q.L.S.'s condition and concluded that Q.L.S remained disabled (*Id.,* at 23, 178). On March 6, 2018, Q.L.S. had two medically-determinable impairments: learning disorder and attention deficit hyperactivity disorder ("ADHD") (*Id.*, at 23). The March 6, 2018, review became the Comparison Point Decision ("CPD") for Q.L.S.'s next review.

At Q.L.S.'s next review on September 17, 2021, the SSA determined that Q.L.S., who was then 12 years old, had improved and was no longer disabled as of September 1, 2021 (*Id.,* at 20, 151). The discontinuation of benefits was upheld on reconsideration (*Id.,* at 20). Thereafter, Q.L.S.'s grandmother, Shellie Franklin, requested a hearing before an Administrative Law Judge ("ALJ") (*Id*). At the hearing on February 7, 2023, Franklin and Q.L.S. appeared *pro se* (*Id.*, at 20, 101, 103–108).

The ALJ issued a decision on February 28, 2024, affirming that Q.L.S.'s disability ended on September 1, 2021 (*Id.*, at 32). First, the ALJ found that Q.L.S.'s impairments had medically improved as of September 1, 2021 (*Id.*, at 23–24). The ALJ then determined that Q.L.S.'s impairments no longer met or medically equaled an impairment listed in 20 C.F.R. Part 404, subpart P, Appendix 1 (*Id.*, at 24). Next, the ALJ found that Q.L.S. had not developed any additional impairments since Q.L.S.'s CPD (*Id.*) Finally, the ALJ evaluated functional equivalency, finding that Q.L.S. had a marked limitation in only one domain—acquiring and using information (*Id.*, at 27). The ALJ concluded, therefore, that Q.L.S.'s impairments had not met, medically equaled, or functionally equaled a listed impairment since September 1, 2021, effectively ending Q.L.S.'s disability (*Id.*, at 31–32).

Franklin requested review and supplied additional school and medical records to the Appeals Council (*Id.*, at 38–100). On December 13, 2024, the Appeals Council found that the additional evidence did not show a reasonable probability of changing the outcome of the decision and denied review, making the ALJ's decision the final decision of the Commissioner (*Id.*, at 10–11). On May 1, 2025, Franklin filed this action (Dkt. No. 2).

## II. Objections

### A. Medical Improvement Finding

Franklin's first objection to the Recommendation is that the ALJ improperly found that Q.L.S. had medically improved because Q.L.S. continued to receive special-education services, continued to have an Individualized Education Program ("IEP"), and required accommodations for ADHD symptoms (Dkt. No. 25, at 2–4).

"Medical improvement is any decrease in the medical severity of [the child's] impairment(s) which was present at the time" of the CPD. 20 C.F.R. § 416.994a(c). Although "the decrease in severity may be of any quantity or degree," the ALJ must "disregard minor changes in [the child's] signs, symptoms, and laboratory findings that obviously do not represent medical improvement and could not result in a finding that [the] disability has ended." *Id.*

At the time of the CPD, Q.L.S.: (1) had the medically determinable impairments of a learning disorder and ADHD; (2) received special education services and an Individualized Education Plan ("IEP") for Q.L.S.'s learning disorder and ADHD; (3) performed well below grade level in multiple subjects; and (4) received a teacher report noting obvious to serious problems in multiple domain areas of development (Dkt. No. 7, at 23–24).

At the time of the ALJ's decision, however, the ALJ noted that—while Q.L.S. continued to receive special education services and receive an IEP for ADHD symptoms—Q.L.S. had stopped receiving treatment for Q.L.S.'s condition, and Q.L.S.'s teacher report did not indicate any serious behavioral problems at school (*Id.*, at 24). As the ALJ and Recommendation note, Q.L.S.'s teacher report at the time of the CPD stated that Q.L.S. had a serious problem "playing cooperatively" and "seeking attention appropriately" (*Id.*, at 288), whereas Q.L.S.'s teacher report near the time of the ALJ's decision did not note any serious behavior problems at school (*Id.*, at

24; *see id.*, at 85 (giving Q.L.S. a "high average" social score)) and an IEP assessment noted that Q.L.S. was "sociable" (*Id.*, at 47).

Further, the ALJ referred to: (1) Dr. Kenneth Jones's report, which stated that Q.L.S. appeared capable of learning and performing basic, repetitive tasks with appropriate supervision, displayed average attention and concentration, and could complete age-appropriate tasks (*Id.*, at 25, 442–46) and (2) Q.L.S.'s psychological evaluation, which indicated areas of relative strength in word knowledge, retrieving acquired information with verbal expression, and good reasoning skills (*Id.*, at 25, 42).

Therefore, the ALJ's finding that Q.L.S. had medically improved—a finding of "*any* decrease in the medical severity of [Q.L.S.'s] impairment(s) which was present at the time" of the CPD, 20 C.F.R. § 416.994a(c) (emphasis added)—is supported by substantial evidence in the record. Accordingly, Franklin's objection fails to rebut the Recommendation.

**B. No Limitation Finding**

Franklin's second objection to the Recommendation is that the ALJ improperly found that Q.L.S. had no limitation in the domains of interacting and relating with others and caring for oneself (Dkt. No. 25, at 4–5).

After finding a medical improvement, an ALJ considers whether the impairments previously identified at the CPD still meet or equal the severity finding made at the time of the CPD. 20 C.F.R. § 416.994a(b)(2). If the ALJ finds that the current impairments do not meet or equal the severity of the impairments at the time of the CPD, the ALJ then determines whether the child is currently disabled, considering all impairments the child now has, including any impairments that the child did not have or that were not considered at the time of the CPD. 20 C.F.R. § 146.994a(b)(3).

The ALJ follows an additional three-step analysis to determine if a child is currently disabled. First, the ALJ determines whether the child currently has a severe impairment or combination of impairments. 20 C.F.R. § 416.994a(b)(3). A medically determinable impairment or combination of impairments is severe unless it is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R § 416.924(c). If the child has a severe impairment or combination of impairments, the ALJ then determines whether the child's impairment or combination of impairments meets or medically equals the severity of any impairment listed in 20 C.F.R. Part 404, subpart P, Appendix 1. 20 C.F.R. § 416.994a(b)(3)(ii). If the child's impairments do not meet or medically equal the severity of a listed impairment, the ALJ determines whether the child's severe impairment or combination of impairments "functionally equal" a listed impairment. 20 C.F.R. § 416.994a(b)(3)(iii). If so, the ALJ must find that the child's disability continues. 20 C.F.R. § 416.994a(b)(3)(iii).

To "functionally equal" a listed impairment, a severe impairment or combination of impairments "must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)–(vi).

A limitation is considered "marked" when the impairment or combination of impairments "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when the child's impairment or combination of impairments "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

When evaluating functional equivalence, the ALJ must assess the interactive and cumulative effects of all impairments for which there is evidence, including any impairments that are not severe. 20 C.F.R. § 416.926a(a). Moreover, when determining whether a limitation on a child's functioning is marked or extreme, the ALJ must "compare [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1).

Here, the ALJ found that the impairments previously identified in Q.L.S.'s CPD did not still meet or equal the severity finding made at the time of the CPD (Dkt. No. 7, at 24). Therefore, the ALJ turned to the three-step analysis to determine if Q.L.S. was currently disabled. The ALJ first determined that Q.L.S.'s impairments or combination of impairments did not meet or medically equal the severity of any impairment listed in 20 C.F.R. Part 404, subpart P, Appendix 1 (*Id.*, at 32). Turning to whether Q.L.S.'s impairments functionally equaled a listed impairment, the ALJ found that Q.L.S. did not have a "marked limitation" in two domains or an "extreme" limitation in one domain (*Id.*).

Franklin asserts that the ALJ improperly found that Q.L.S. did not have a "marked" or "extreme" limitation in the domains of: (1) interacting and relating with others; and (2) caring for oneself (Dkt. No. 25, at 4–5). As to the domain of interacting and relating with others, the ALJ found that Q.L.S. had no deficit in this area and cited to record evidence showing that Q.L.S had friends and clear speech during a mental status evaluation (Dkt. No. 7, at 29, 64, 443, 464, 466). Although evidence in the record could support a different conclusion, the ALJ's decision is within the available "zone of choice" and is supported by substantial evidence in the record. *Ross v. O'Malley*, 92 F.4th 775, 779 (8th Cir. 2024) (holding that affirmance is appropriate where the record supports two inconsistent conclusions, both of which are in the available zone of choice).

As to Q.L.S.'s ability to care for himself, the ALJ stated that the record indicated that Q.L.S. has no limitation in this domain (Dkt. No. 7, at 31). Activities which may indicate a limitation in the domain of caring for oneself include using self-soothing activities that are developmentally regressive, failing to dress and bathe age-appropriately, engaging in self-injurious behavior, ignoring safety rules, and having disturbances in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3). While there is evidence in the record that Q.L.S. self-reported symptoms of depression, poor appetite or overeating, and feeling tired or having little energy (Dkt. No. 7, at 461), the same report which provided this evidence also gave Q.L.S. an "overall risk rating" of "low" (*Id.*, at 463), and listed Q.L.S. as having a "[w]ell [g]roomed" appearance, average demeanor, clear speech, normal activity level, and average eye contact (*Id.*, at 465). The record also contains other evidence supporting the ALJ's decision (*See*, *e.g., id.*, at 44 (receiving the highest adaptive skills score in "Self-Care")). Therefore, the ALJ's finding that Q.L.S. had no marked limitation in the domain of caring for oneself is supported by substantial evidence and is within the available "zone of choice." *Ross*, 92 F.4th at 779.

In sum, the ALJ's finding that Q.L.S. had no limitation in the domains of interacting and relating with others and caring for oneself is supported by substantial evidence, and Franklin's objection fails to rebut the Recommendation.

### C. Evidence Of PTSD And Depression

Franklin's third objection to the Recommendation is that the ALJ failed to consider the whole record in assessing Q.L.S.'s impairments (Dkt. No. 25, at 5–6).

As discussed previously, upon finding that a child's impairments do not meet or equal the severity of the impairments at the time of the CPD, the ALJ must determine whether the child is currently disabled, considering all impairments the child now has, including any that the child did

not have or were not considered at the time of the CPD. 20 C.F.R. § 146.994a(b)(3). An ALJ is required to "consider the combined effects of all [a child's] impairments upon . . . overall health and functioning." 20 C.F.R. § 416.924(a). An impairment must be "medically determinable," 20 C.F.R. § 416.924(c), meaning that the impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," and "it must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 416.921.

Here, Franklin submitted evidence of Q.L.S.'s PTSD and depression in the form of a report by Erin Wren, a Licensed Master Social Worker ("LMSW") (Dkt. No. 7, at 460). However, an LMSW is not an "accepted medical source," 20 C.F.R. § 416.902(a), and therefore Wren's report could not establish that Q.L.S.'s PTSD and depression were an impairment. 20 C.F.R. § 416.921. Nonetheless, the ALJ acknowledged Q.L.S.'s reported PTSD and depression in Wren's report and considered the reported PTSD and depression when assessing Q.L.S.'s combination of impairments (Dkt. No. 7, at 26).

After the ALJ issued the opinion, Q.L.S. saw Marcie Tuggle, an Advanced Practice Registered Nurse ("APRN"), who diagnosed Q.L.S. with PTSD and major depressive disorder (Dkt. No. 7, at 75). Tuggle is an "accepted medical source." 20 C.F.R. § 416.902. Tuggle's report provided statements by Q.L.S. that Q.L.S. had "some anxiety and some little panic attacks," was not sleeping well, and was "suffer[ing] from depression sometimes" due to Q.L.S.'s mother's death (Dkt. No. 7, at 70). The testing Tuggle performed in her report indicates that "[o]ver the last 2 weeks" Q.L.S. had been suffering from signs of depression and anxiety (*Id.*, at 76–77).

Because this additional information was submitted to the Appeals Council and the Appeals Council denied Franklin's appeal, the Court must consider whether the ALJ's decision in

considering Q.L.S.'s impairments is supported by substantial evidence on the record as a whole, including the new evidence. *Kitts v. Apfel*, 204 F.3d 785, 786 (8th Cir. 2000) ("When the Appeals Council has considered new and material evidence and declined review, we must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence"); *Jenkins v. Apfel*, 196 F.3d 922, 924 (8th Cir. 1999) ("In addition to evidence before the ALJ, the record includes evidence that was submitted after the hearing and considered by the Appeals Council in denying review"). "Evaluating such evidence requires [the Court] to determine how the ALJ would have weighed the newly submitted evidence if it had been presented at the original hearing." *Jenkins*, 196 F.3d at 924.

Franklin argues that, in the light of Tuggle's subsequent report, the ALJ's decision on whether Q.L.S. suffered from a combination of impairments functionally equaling a listed impairment is not supported by substantial evidence on the record as a whole because Tuggle's report provided evidence of PTSD and depression from a "medically accepted" source that would have changed the ALJ's assessment of Q.L.S.'s combination of impairments (Dkt. No. 25, at 5–6). The Court disagrees.

The ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," (Dkt. No. 7, at 24), including Q.L.S.'s outpatient therapy for PTSD and depression and the reports of Q.L.S.'s depressed mood related to the death of Q.L.S.'s mother (*Id.*, at 26, 460–81). Tuggle's subsequent report largely mirrors the information found in Wren's report, relies on Q.L.S.'s description of symptoms information, *see* 20 C.F.R. § 416.921 ("We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)"), and used a medical test which asks only about symptoms during the two weeks prior to the report (Dkt. No. 7, at 76–

77). Even in the light of Tuggle's report, there is substantial evidence in the record to support the ALJ's finding that the reported PTSD and depression, in combination with Q.L.S.'s other impairments, did not functionally equal a listed impairment (*See*, *e.g., id.*, at 470, 471, 473, 477, 479, 481 (Wren reporting that Q.L.S. appeared "[e]uthymic," has "been feeling well," has "been working to maintain a positive mood," and "shared cheerfully throughout the session and reported no risk or concern"); *id.*, at 70 (Tuggle reporting that Q.L.S. was suffering from depression "sometimes" due to Q.L.S.'s mother's death and that Q.L.S. reported "some anxiety and some little panic attacks")).

The ALJ considered the impact and severity of Q.L.S.'s reported PTSD and depression in considering whether the combination of Q.L.S.'s impairments functionally equaled a listed impairment, that conclusion is supported by substantial evidence in the record, and, even when considered, Tuggle's subsequent report did not add information which changed the fact that the ALJ's decision is within the "zone of choice" and supported by substantial evidence in the whole record. *Ross*, 92 F.4th at 779. Therefore, Franklin's objection fails to rebut the Recommendation.

### D. Duty To Develop The Record

Franklin's final objection to the Recommendation is that the ALJ failed to satisfy the ALJ's duty to develop the record fairly and fully (Dkt. No. 25, at 6–7). Franklin argues that the ALJ should have ordered updated psychological consultative examinations or a functional assessment addressing Q.L.S.'s mental health symptoms that were reported between February 2023 and May 2023 (*Id.*, at 7).

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). The issue for the Court to determine, however, is not whether the

ALJ should have "order[ed] a consultative evaluation of every alleged impairment" but rather "whether the record contained sufficient medical evidence for the ALJ to make an informed decision" about the alleged impairment. *Matthews v. Bowen*, 879 F.2d 422, 424 (8th Cir. 1989). The claimant "bears a heavy burden in showing the record has been inadequately developed," *Combs v. Astrue*, 243 F. App'x 200, 204 (8th Cir. 2007), and "[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) (citing *Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986)). Further, "absent unfairness or prejudice, [the Court] will not remand" for failing to develop the record. *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).

Here, the record provided sufficient evidence for the ALJ to make an informed decision regarding the severity and impact of Q.L.S.'s PTSD and depression in assessing Q.L.S.'s combination of impairments, and the ALJ was not required to order an updated psychological consultative examination or a functional assessment. As discussed previously, the ALJ was aware of Q.L.S.'s outpatient therapy for PTSD and depression, as well as "clinical information show[ing] that the claimant had a depressed mood related to the death of [Q.L.S.'s] mother in May 2021" (Dkt. No. 7, at 26). The ALJ specifically referenced evidence in the record that Q.L.S.: (1) had a low risk level of harm to himself and others; (2) was engaged with peers, had at least five friends, and had no social inhibitions; (3) had an average demeanor, clear speech, and normal activity level; (4) attended school and had a supportive social environment; and (5) had a positive treatment prognosis (*Id.*, at 26, 63–66).

Additionally, Wren's follow up reports regarding Q.L.S.'s PTSD and depression also provided the ALJ with evidence to evaluate Q.L.S.'s reported PTSD and depression (Dkt. No. 7,

at 470–81). After Wren's initial report on PTSD and depression, Wren reported that: Q.L.S.'s mood was "[e]uthymic" (*Id.*, at 470, 473, 479); Q.L.S. "appeared pleasant during the session," "has been working to maintain a positive mood," and "will continue working to decrease mood disturbances," despite difficult scenarios Q.L.S. faced (*Id.*, at 471); Q.L.S. "appeared cheerful during the session," despite continued issues in thinking about Q.L.S.'s mother's passing and past trauma (*Id.*, at 474); Q.L.S. "has been feeling well" despite "depressive moods due to [Q.L.S.'s] grandmother not fully understanding him" (*Id.*, at 477); and Q.L.S.'s prognosis was "good" (*Id.*, at 471, 474, 477, 480). In Wren's last report, Wren reported that Q.L.S. "has been maintaining a positive mood," "reported that communication has been better within the home," and "shared cheerfully throughout the session and reported no risk or concern" (*Id.*, at 481).

As discussed previously, Tuggle subsequently reported that Q.L.S. had "some anxiety and some little panic attacks," was not sleeping well, and was "suffer[ing] from depression sometimes" due to Q.L.S.'s mother's death (Dkt. No. 7, at 70). The testing Tuggle performed in her report indicates only that "[o]ver the last 2 weeks" Q.L.S. had been suffering from signs of depression and anxiety (*Id.*, at 76–77). There is no evidence in the record related to Q.L.S.'s reported PTSD or depression from the period between Wren's last report on June 1, 2023, and Tuggle's April 3, 2024, report, nor is there evidence in the record related to Q.L.S.'s reported PTSD or depression beyond the "last 2 weeks" proceeding Tuggle's April 3, 2024, report.

While Wren and Tuggle's reports provided some evidence of PTSD and depression, the same reports also indicated that Q.L.S.'s symptoms were present "sometimes" (*Id.*, at 70), that Q.L.S. "appeared cheerful," "has been feeling well," and reported "no risk or concern" (*Id.*, at 470–81), and that Q.L.S continued to receive a "good" treatment prognosis (*Id.*). The record evidence also showed that Q.L.S. was able to maintain social relationships, had a low risk level of

harm to himself or others, was not inhibited from attending school, and was experiencing his symptoms as a result of his mother's passing rather than as a chronic issue (*Id.*, at 26, 463–66). Based on this record, the ALJ had sufficient evidence to make an informed decision regarding the severity and impact of Q.L.S.'s reported PTSD and depression in assessing Q.L.S.'s combination of impairments, and the ALJ was not required to order additional medical examinations or further develop the record regarding Q.L.S.'s PTSD or depression. *See Matthews*, 879 F.2d at 424–25 (finding no error in an ALJ evaluating non-severe situational depression without a consultative exam because the record contained sufficient medical evidence for the ALJ to make an informed decision); *Combs*, 243 F. App'x at 205 (holding that a record contained sufficient evidence regarding non-severe depression for an ALJ to make an informed decision, despite a psychiatric examination not being completed and the record containing several references to the claimant's depression from a community health center).

Further, Franklin fails to identify how the failure to obtain an updated psychological assessment—or otherwise further develop the record regarding Q.L.S.'s reported PTSD and depression—has caused unfairness or prejudice. *Onstad*, 999 F.2d at 1234. As discussed previously, the ALJ considered Q.L.S.'s reported PTSD and depression in reaching the ALJ's decision, there is substantial evidence in the record for the ALJ to determine the impact and severity of the PTSD and depression, and there is substantial evidence in the record for the ALJ to conclude that Q.L.S.'s combination of impairments did not functionally equal a listed impairment. Tuggle's subsequent report largely mirrors the evidence already in the record, and Franklin: (1) provides no other evidence indicating that Q.L.S.'s PTSD and depression are more severe than was already known to the ALJ; and (2) offers no explanation as to how additional development of the record regarding PTSD and depression would change the ALJ's determination that Q.L.S.'s

impairments do not functionally equal a listed impairment. Accordingly, Franklin's objection fails to meet the "heavy burden in showing the record has been inadequately developed" and fails to rebut the Recommendation. *Combs*, 243 F. App'x at 204.

**III. Conclusion**

For the foregoing reasons, the Court adopts the Recommendation in its entirety (Dkt. No. 24). The Commissioner's decision is affirmed.

It is so ordered this 22nd day of September, 2026.

Kristine G. Baker
Chief United States District Judge